ACCEPTED
04-14-00746-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
3/6/2015 1:44:55 PM
KEITH HOTTLE
CLERK

# NO. 04-14-00746-CV

IN THE TEXAS COURT OF APPEALS FOR THE FOURTH DISTRICT
SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
3/6/2015 1:44:55 PM
KEITH E. HOTTLE
Clerk

* * * * *

## ALAMO HEIGHTS INDEPENDENT SCHOOL DISTRICT,
**Appellant**

v.

## CATHERINE CLARK,
**Appellee**

* * * * *

On Accelerated Interlocutory Appeal from the 285th Judicial District Court
Bexar County, Texas
Cause No. 2009-CI-19821

* * * * *

## APPELLEE'S BRIEF

* * * * *

Respectfully submitted,

Brendan K. McBride
State Bar No. 24008900
brendan.mcbride@att.net
MCBRIDE LAW FIRM, of Counsel
  to GRAVELY & PEARSON, LLP
425 Soledad, Suite 620
San Antonio, Texas 78205
(210) 227-1200 Telephone
(210) 881-6752 Facsimile

Matthew R. Pearson
State Bar No. 00788173
mpearson@gplawfirm.com
Tracie Gee Conner
State Bar No. 24074066
tconner@gplawfirm.com
GRAVELY & PEARSON, L.L.P.
425 Soledad, Suite 600
San Antonio, TX 78205
(210) 472-1111 Telephone
(210) 472-1110 Facsimile

**ATTORNEYS FOR APPELLEE,
CATHERINE CLARK**

i

## <u>IDENTITY OF PARTIES AND COUNSEL</u>

### Parties

Alamo Heights Independent School District  Appellant/Defendant


Catherine Clark  Appellee/Plaintiff

### Counsel

Robert A. Schulman
State Bar No. 17834500
Leonard J. Schwartz
State Bar No. 17867000
Bryan P. Dahlberg
State Bar No. 24065113
SCHULMAN, LOPEZ & HOFFER, L.L.P
517 Soledad Street
San Antonio, TX 78205
(210) 538-5385  Appellate and Trial Counsel for
(210) 538-5384 (Fax)  Appellant/Defendant

Brendan K. McBride
MCBRIDE LAW FIRM, Of Counsel
 to GRAVELY & PEARSON, LLP
425 Soledad, Suite 620
San Antonio, Texas 78205
(210) 227-1200 Telephone
(210) 881-6752 Facsimile  Appellate Counsel for Appellee/Plaintiff

Matthew R. Pearson
State Bar No. 00788173
mpearson@gplawfirm.com
Tracie Gee Conner
State Bar No. 24074066
tconner@gplawfirm.com
GRAVELY & PEARSON, L.L.P.
425 Soledad, Suite 600
San Antonio, TX 78205
(210) 472-1111 - Telephone  Appellate and Trial Counsel for
(210) 472-1110 Facsimile  Appellee/Plaintiff

# TABLE OF CONTENTS

Page

IDENTITY OF PARTIES AND COUNSEL..................................................................ii

TABLE OF CONTENTS...............................................................................................ii

TABLE OF AUTHORITIES..........................................................................................v

STATEMENT OF THE CASE.....................................................................................ix

THE RECORD...............................................................................................................x

STATEMENT OF FACTS.............................................................................................1

SUMMARY OF THE ARGUMENT..........................................................................26

ARGUMENT AND AUTHORITIES .........................................................................27

    I.   BECAUSE CLARK ALLEGED A PRIMA FACIE CASE OF BOTH DISCRIMINATION AND RETALIATION, SOVEREIGN IMMUNITY IS WAIVED UNDER THE TCHRA. ...............27

    II.  CLARK ALLEGED A PRIMA FACIE CASE OF DISCRIMINATION ON THE BASIS OF SEX. .........................................................................................................................33

        A.     The same-sex harassment perpetrated by Monterrubio and Boyer was gender based..................................................................................................34

        B.     The Harassment was sufficiently severe or pervasive as to alter the conditions of Clark's employment and create an abusive working environment. ......................................................................................................36

        C.     One of the Harassers, Michelle Boyer, was Clark's Supervisor. ....................41

        D.     The District knew, or should have known of the harassment, was negligent in control of the workplace, and did not take prompt remedial action. .......42

    III. CLARK ALLEGED A PRIMA FACIE CASE OF UNLAWFUL RETALIATION. ..............45

        A.     To overcome a Plea to the Jurisdiction, Clark is not required to show the District's articulated reason for her termination is pretext. ...........................46

        B.     Clark Engaged in Protected Activity. .................................................................46

        C.     There is a Causal Connection Between Clark's Termination and Her Reporting of Boyer and Monterrubio's Unlawful Conduct............................48

        D.     Clark exhausted her administrative remedies, and collateral estoppel does not apply in this case..........................................................................................49

F.    Arguing in the alternative, the District's reasons for Clark's termination were pretext. ....................................................................................51

CONCLUSION & PRAYER ..............................................................................55

CERTIFICATE OF SERVICE ............................................................................57

CERTIFICATE OF COMPLIANCE ...................................................................57

# TABLE OF AUTHORITIES

Page

**Cases**

*Austin Indep. Sch. Dist. v. Lowery,* 212 S.W.3d 827 (Tex. App.—Austin 2006, pet. denied) .................................................................................................................53

*Barnett v. Boeing Co.*, 306 Fed. App'x 875 (5th Cir. 2009) ....................................42

*Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257 (3d Cir. 2001) ......................36

*Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547 (Tex. 2000)............................. 31, 32

*Bowen v. El Paso Electric Co.*, 49 S.W.3d 902 (Tex. App.—El Paso 2001) ........................56

*Byers v. Dallas Morning News, Inc.*, 209 F.3d 419 (5th Cir. 2000)............................47

*Celestine v. Petroleos de Venezuela S.A.*, 266 F.3d 343 (5th Cir. 2001)..................................34

*Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802 (Tex. App. – Houston [1st Dist.] 2012, no pet.)..................................................................................................47

*City of Laredo v. Negrete*, No. 04-08-00737, 2010 Tex. App. LEXIS 903 (Tex. App.—San Antonio Feb. 10, 2010, pet. denied.)............................................................40

*City of San Antonio v. Cancel*, 261 S.W.3d 778 (Tex. App.—Amarillo 2008) ....................36

*City of Waco v. Lopez*, 259 S.W.3d 147 (Tex. 2008) ..............................................47

*County of Cameron v. Brown*, 80 S.W.3d 549 (Tex. 2002) ......................................28

*Cox & Smith, Inc. v. Cook*, 974 S.W.2d 217 (Tex. App.—San Antonio 1998, pet. denied) .................................................................................................................50

*E.E.O.C. v. Omni Hotels Mgmt. Corp.*, 516 F. Supp. 2d 678 (N.D. Tex. 2007) ................58

*EEOC v. Boh Bros., Constr. Co., L.L.C.*, 731 F.3d 444 (5th Cir 2013)...............................36

*El Paso Cmty. College v. Lawler*, 349 S.W.3d 81 (Tex. App.—El Paso 2010) ....................56

*Ellison v. Brady,* 924 F.2d 872 (9th Cir. 1991)..........................................................................38

*Evans v. City of Houston,* 246 F.3d 351 (5th Cir. 2001) ...........................................................54

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)................................................................38

*Fort Bend Indep. Sch. Dist. v. Williams*, No. 01-13-00052-CV, 2013 Tex. App. LEXIS 11428 (Tex. App.—Houston [1st Dist.] Sept. 5, 2013) ...............................................30

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978)......................................................... 34, 56

*Gearhart v. Eye Care Centers of America*, 888 F. Supp. 814 (S.D. Tex. 1995).....................41

*Green v. Indus. Specialty Contractors, Inc.*, 1 S.W. 126 (Tex. App. – Houston [1st Dist.] 1999, no pet.)...............................................................................................................34

*Hale v. Napolitano*, No. SA-08-CV-106-XR, 2009 U.S. Dist. LEXIS 44723 (W.D. Tex. May 28, 2009) ............................................................................................................42

*Hancock v. Barron Builders & Mgmt Co., Inc.*, 523 F. Supp. 2d 571 (S.D. Tex. 2007).......42

*Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428 (5th Cir. 2005) .............................. 38, 42

*Hockman v. Westward Communs., LLC*, 407 F.3d 317 (5th Cir. 2004)..............................41

*Hs Tejas v. City of Houston*, No. 01-13-00864-CV, 2015 Tex.App.LEXIS 2136 (Tex. App. – Houston[1st Dist.] March 5, 2015, no pet. f.)...................................................28

*Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413 (Tex. 2000) ..............................33

*James v. Platte River Steel Co.*, 113 F.App'x 864 (10th Cir. 2004) ........................................36

*KIPP, Inc. v. Whitehead*, 446 S.W.3d 99 (Tex. App.—Houston [1st Dist.] 2014, pet. filed) ................................................................................................................................31

*Lauderdale v. Tex. Dep't of Crim. Justice,* 512 F.3d 157 (5th Cir. 2007) ..............................38

*Lueck v. State*, 325 S.W.3d 752 (Tex. App. – Austin 2010, no pet.) .......................... 28, 32

*McDonnell Douglas Corp v. Green,* 411 U.S. 792 (1973).......................................................48

vi

*Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629 (Tex. 2012) ....................passim

*Nairn v. Killeen Indep. Sch. Dist.*, 366 S.W.3d 229 (Tex. App.—El Paso 2012, no pet.)..53

*Oncale v. Sundowner Offshore Svcs.,* 523 U.S. 75 (1998) ........................................36

*Phan Son Van v. Pena*, 990 S.W.2d 751 (Tex. 1999) ............................................33

*Ptomey v. Tex. Tech Univ.*, 277 S.W.3d 487 (Tex. App. – Amarillo 2009, pet. denied)....48

*Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133 (2000) ....................................56

*Rosenberg v. KIPP, Inc.,* No. 14-13-00969-CV, 2015 Tex. App. LEXIS 811 (Tex. App.—Houston [14th Dist.] Jan. 29, 2015, no pet.) ...................................................29

*Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396 (5th Cir. 2013)...............................41

*Rusk State Hosp. v. Black*, 392 S.W.3d 88 (Tex. 2012) ..........................................53

*Septimus v. Univ. of Houston*, 399 F.3d 601 (5th Cir. 2005) ...................................38

*Sharyland ISD v. Molina*, No 13-12-00625-CV, 2013 Tex. App. LEXIS 11908 (Tex. App.—Corpus Christi 2013)...............................................................52, 53

*Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871 (5th Cir. 1999).............................41

*Shepherd v. Slater Steels Corp.*, 168 F.3d 998 (7th Cir. 1999).................................36

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ..................................34

*Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217 (Tex. 2004)..............31, 32, 33

*Tex. State Office of Admin. Hearings v. Birch*, No. 04-12-00681-CV, 2013 Tex. App. LEXIS 9065 (Tex. App.—San Antonio Jul. 24, 2013, pet. denied)...........................31

*Vela v. Waco Indep. Sch. Dist.*, 69 S.W.3d 695 (Tex. App.—Waco 2002) ........................52

*Wade v. Minyard Food Stores,* No. 3:03-CV-1403-B, 2005 U.S. Dist. LEXIS 4973 (N.D. Tex. Mar 25, 2005) .......................................................................54

*Waffle House, Inc. v. Williams*, 313 S.W.3d 796 (Tex. 2010).............................37, 38

*Wal-Mart Stores, Inc. v. Itz,* 21 S.W.3d 456 (Tex. App.—Austin 2000, pet denied) ........40

*Weeks v. NationsBank, N.A.*, No. 3:98-CV-1352-M, 2000 U.S. Dist. LEXIS 4069 (N.D. Tex. Mar. 30, 2000) ................................................................................................54

**Statutes**

Texas Labor Code § 21.001 ................................................................................................49

## STATEMENT OF THE CASE

**Nature of the Case:** This is an employment case arising out of the termination of Catherine Clark's employment as a physical education teacher and coach at the Alamo Heights Independent School District in August, 2009. Clark is a female. Following her filing of a complaint with the EEOC and Texas Workforce Commission in October 2008, Clark's employment was terminated. In December, 2009, Clark filed this suit against the school district for: (1) unlawfully discriminating against her because of her sex (sexual harassment) in violation of the Texas Commission on Human Rights Act (Tex. Lab. Code Chapter 21, "TCHRA"), and (2) for retaliation against her for filing a complaint about actions that violated the TCHRA. Appellant filed its Plea to the Jurisdiction on June 19, 2014. (CR 33-92)

**Trial Court:** The case is docketed in the 285th Judicial District Court, Bexar County, Texas. However, the order subject to this appeal was signed by Hon. Karen Pozza, presiding judge of the 407th Judicial District Court, Bexar County, Texas.

**Trial Court Disposition:** Following a hearing on the school district's plea to the jurisdiction on October 8, 2014, the district court signed and entered an order on October 9, 2014 denying the plea. (CR 459) Alamo Heights ISD then filed this accelerated, interlocutory appeal. (CR 460-61)

## THE RECORD

The record on appeal consists of an initial Clerk's Record (cited as "CR"), two volumes that were subsequently filed as the Supplemental Clerk's Record (cited as "Supp. CR, Vol. I." and "Supp. CR, Vol. II."), and the Second Supplemental Clerk's Record received by the Court on February 13, 2015 ("Sec. Supp. CR").

## STATEMENT OF FACTS

This is an accelerated, interlocutory appeal of an order denying a plea to the jurisdiction in an employment discrimination case brought against Alamo Heights Independent School District ("AHISD" or the "District") by a former physical education teacher and coach, Catherine Clark, for sex discrimination (hostile work environment sexual harassment) and retaliation in violation of the Texas Commission on Human Rights Act. ("TCHRA")

### Clark's Allegations

The following pertinent facts are alleged against the District as the basis of Clark's claims under the TCHRA:

Clark was hired by the District as a physical education teacher and coach at the Alamo Heights Junior School (AHJS) and began working for the District during the 2007-2008 school year. Clark's direct supervisor was Michelle Boyer (formerly Michelle Land), the Athletic Coordinator at AHJS. (CR 229-30) The Athletic Coordinator was supervised by the campus Principal and Assistant Principals. (CR 225).

Clark's performance review after approximately ninety days working with the district was perfect. (CR 235-36, 391-96) Clark's annual evaluation, after her first year of employment in 2008, was likewise very good. (CR 397-404) The first and only negative evaluation she received was in 2009 after she filed a protected report of sexual harassment.

1

**Sexual Harassment While At AHJS**

As soon as Clark started working for the District, Anne Monterrubio, another coach, began sexually harassing her. During New Teacher Orientation Meetings in August 2007, Monterrubio repeatedly made remarks to Clark about Assistant Principal Georgia Frank's breasts, asking if she thought they were real. (CR 328; Sec. Supp. CR 199) Soon afterward, Monterrubio began making remarks about Clark's body. During a lesson on the tennis court, Monterrubio commented about Clark's black shirt, saying, "Wow, Coach Clark, I think your boobs are going to pop out of your shirt!" (CR 329) The next day, Monterrubio told Clark that she could see Clark's "G-string" through her pants and that she could see the "dimple" in her "ass." (CR 329) Throughout that week, Monterrrubio continued to talk about Clark's breasts and buttocks. (CR 329)

Clark told her friend Annette Kessler in the fall of 2007 about Monterrubio's unwelcome sexual advances, explaining how "[i]t was creepy in the way Monterrubio was looking at me." (Sec. Supp. CR 185) Clark told Kessler that she needed to do something about Monterrubio's conduct. (Sec. Supp. CR 185)

In mid-October 2007, Clark reported to Girls Athletic Coordinator Michelle (Boyer that Monterrubio was using offensive language and making Clark the target of sexual jokes. (CR 329) Boyer was already aware of the comments because she overheard several of them. (CR 326) Clark made it clear to both Boyer and Monterrubio that she was offended and threatened by the manner in which

2

Monterrubio talked to and about her. (CR 329) Boyer did nothing to stop the harassment, nor did she report Clark's complaint to any member of the administration.[1] Instead, Boyer began to make improper sexual comments to Clark as well. (CR 326)

Monterrubio continued to make sexual remarks to Clark, including remarks about her breasts. In November of 2007, Monterrubio informed Clark that the "guy coaches were betting that [her] breasts were fake," and insisted that they were. (CR 329) Because of Monterrubio's harassment, Clark became increasingly self-conscious of her body, to the point of habitually wearing jackets over her clothes or propping files or papers on her knees to cover her chest when sitting in meetings. (CR 329)

At the faculty Christmas party in 2007, Clark attempted to participate as part of the athletic department faculty. As the coaches posed for group photographs in front of the Christmas tree, Monterrubio and Boyer grabbed Clark's buttocks:

> Q. But horseplay pretty well describes what you're talking about?
> A. I just kind of -- when I saw them touching each other, it just kind of looked like they were --
> you know.
> Q. Fooling around having a good time?
> A. Fooling around, **but when it was with me, it was kind of done in a manner that was -- first of all,**
> **I had already told them to stop touching me. So the fact that they did it, they -- they snuck it kind of -- we were posing for a picture and they kind of reached around so nobody else would see it.** So I knew
> it wasn't playing around because that's not the way I play.

---

[1] Later, on at least one occasion, in response to Catherine's requests that she stop the profanity in the office, Boyer responded that she did not have to make it stop and that Gene Phillips, the District Athletic Director would back her up and was not bothered by the profanity. (Sec. Supp. CR 197)

3

(Sec. Supp. CR 191)[2]

Clark was initially too intimidated to complain to the principal, Stephanie Kershner, because Monterrubio had made statements about Kershner retaliating against others from the workplace in the past. (CR 328) Clark had also heard that Kershner was vengeful and anyone crossing her was "doomed." (Sec. Supp. CR 198) Furthermore, Clark had already complained to her supervisor, Boyer, and that complaint had not only been ignored, but actually worsened the harassment, with Boyer joining in thereafter.

In March 2008, Kershner conducted an observation of Clark's teaching as part of her annual evaluation. Kershner told Clark that she gave her "one of the only or the only perfect [score] she had ever given." (Sec. Supp. CR 209) When they discussed the observation, Clark told Kershner that Boyer and Monterrubio were sexually harassing her. (Sec. Supp. CR 16) Kershner failed to report Clark's complaint to a district official as required by the district's sexual harassment policy or to take any remedial action whatsoever.

Instead, Kershner placed the responsibility on Clark to correct the situation. Kershner told Clark to meet with the wellness counselor, Lisa Lucas, in order to "improve communication" with Monterrubio. (CR 238, 340) As part of the counseling, Clark also informed Lucas that Monterrubio had sexually harassed her,

---

[2] Appellant incorrectly asserted in their brief that Clark did not see who grabbed her buttocks, but a close reading Clark's testimony indicates that Clark indeed knew that Boyer and Monterrubio grabbed her buttocks. (Sec. Supp. CR 190-91, Clark's Deposition.)

4

that the sexual harassment had turned into aggression and that she feared for her safety. (Sec. Supp. CR 211) Monterrubio was no longer touching her but now "bumping" and "blocking" her from moving freely in and out of the office. (Sec. Supp. CR 211) Lucas also failed to follow the District's harassment policy, and did not take corrective action or relay the report to administration.

Finally, on May 11, 2008, upon the advice of Lucas, Clark set up another meeting with Kershner. (Sec. Supp. CR 217) Clark was so distraught during the meeting that she could barely speak. (CR 240-241) However, Kershner was able to ascertain that Clark was telling her about sexual harassment, and that it pertained to Monterrubio and Boyer. (CR 241-42) Kershner told Clark to go to a quiet place to compose herself and write down what she wanted to tell Kershner. (CR 240-41)

On or about May 14, 2008, Clark submitted a written complaint to Kershner, as described above, outlining numerous instances of sexual harassment as well as other retaliatory and harassing conduct by Monterrubio and Boyer. (CR 241-242) In addition to the instances of sexual harassment described above, Clark included the following in her complaint:

> On or about Dec 19, [2007] I the girl coaches exchanged Christmas gifts. When receiving a candle that I gave her, Coach Monterrubio made a remark indicating she was going to make love next to the candle and when it was lit up in her apartment. She said to me: "I will think of you the next time I am f---ing."

> On or about Jan 7, [2008] I arrived at the athletic office and greeted the other coaches with "Happy New Year!" I asked Coach Monterrubio how her break was and she replied: "Awesome. It was a Fuck Fest. I

5

boinked the enter time." I blinked a couple of times and turned by back and got to work.

On or about Jan 30, [2008] when the pizza for the basketball team arrived, Ann watched me open the boxes and told me that I better step back or I would "get pizza sauce on my enormous tits."

On or about Feb 14, [2008] Ann received a photograph on her cell phone during a PE class. She showed both Michelle Land and then me the picture of her boyfriend's private area. He had taken and sent her a photograph of his genitals, which he manipulated into a heart shape for Valentine's Day photographs. I grossed out and replied: "I wish you hadn't shown me that." She told me to "get over it. You're no angel, Clark." . . .

On or about April 18, [2008] Ann told me that she thought Mark Bond and I should "hook up." She continually made comments to both him and to me that we'd make a good couple. I told her that she knew I was married and to stop making inappropriate remarks about it anymore. She did not stop. Twice more that week, knowing it upset me, she brought the subject up again. I told Michelle Land that week that I was tired of Ann teasing me on a daily basis. Nothing was done.

On or about April 23, [2008] as I was eating shrimp for lunch, a student by the name of [ ] poked her head in the office to exclaim, "I smell shrimp! I love shrimp"! Coach Monterrubio made a remark about me closing my legs. And I pray that the students around did not understand her perverted innuendo.

On or about April 28, [2008] Ann and Michelle were laughing about and viewing an email that included a photograph of a naked man on a beach. It was a large man with a small or missing penis. . . Before leaving the office, I admit that, when asked about it, I chuckled and shared my opinion that the man was not castrated. I was trying not to be the "straight-laced, goodie-goodie," odd-man out that Ann portrayed me to be.

Upon returning from Spring Break, [2008] Ann made a comment about how tan my chest was. I wore a black jacket and zipped it up because I was so self-conscience about her looking at my chest.

Please view the attached e-mails (16 total) sent to me on my school computer by Ann Monterrubio. [2007-2008] I repeatedly asked her to stop and told her that I worried we would get in trouble for profane correspondence, but she antagonized me by saying I was acting like a "goodie goodie," which I denied.

(Appendix, Tab 1, Clark's Complaint; *also at* CR 328-41)   The letter also described how Clark was deterred from making a report because she feared retaliation from Monterrubio and Boyer for reporting the harassment.   She wrote that Monterrubio "told [her] that she was a revengeful person and that she had retaliated against others from the workplace in the past" and that people who "mess with her deserve it." Clark wrote, "I fear for the safety of myself and my family."  (CR 328, 341)

**The District's Sexual Harassment Policy**

The District failed to follow its own sexual harassment and retaliation policy. The New Employee Handbook states in part:

> SEXUAL HARASSMENT
> Policy DHC and FNCJ
>
> Employee-to-Employee: Sexual harassment of a coworker is a form of discrimination and is prohibited by law. Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct under the following conditions:
>
> - Submission to such conduct is explicitly or implicitly a term or condition of employment.
> - Submission to or rejection of such conduct is used as a basis for employment decisions.
> - The conduct unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or otherwise offensive work environment.

7

Employees who believe that they have been sexually harassed by another employee are encouraged to come forward with complaints. . . . The district's policy outlining the process of filing complaints of sexual harassment can be found in policy DHC (Local).

(Appendix, Tab 2; *also at* Sec. Supp. CR 250)

The District's Policy **DIA (Local) Employee Welfare: Freedom from Discrimination, Harassment, and Retaliation** defines Sexual Harassment as follows:

Sexual harassment is a form of sex discrimination defined as unwelcome sexual advances; requests for sexual favors; sexually motivated physical, verbal or nonverbal conduct; or other conduct or communication of a sexual nature when:
1. Submission to the conduct is either explicitly or implicitly a condition of an employee's employment, or when submission to or rejection of the conduct is the basis for an employment action affecting the employee; or
2. The conduct is so severe, persistent, or pervasive that it has the purpose or effect of unreasonably interfering with the employee's work performance or creates an intimidating, threatening, hostile, or offensive work environment.

The section of the policy regarding <u>reporting procedures</u> states as follows:

**An employee who believes that he or she has experienced prohibited conduct or believes that another employee has experienced prohibited conduct should immediately report the alleged acts. The employee may report the alleged acts to his or her supervisor or campus principal.**

Alternatively, the employee may report the alleged acts to one of the District officials below.

DEFINITION OF DISTRICT OFFICIALS For the purpose of this policy, District officials are the Title IX coordinator, the ADA/Section 504 coordinator, and the Superintendent.

8

(Sec. Supp. CR 242-43) The District official listed in the policy for reports of discrimination based on sex, including sexual harassment, was Dr. Dana Bashara, Title IX coordinator.[3] (Sec. Supp. CR 244) The policy lists the Superintendent as the coordinator for purposes of District compliance with all other antidiscrimination laws. (Sec. Supp. CR 244) The policy does not have a deadline for filing a complaint and only vaguely addresses the timeliness of reporting, as follows:

> Reports of prohibited conduct shall be made as soon as possible after the alleged act or knowledge of the alleged act.

(Sec. Supp. CR 244) The policy describes how the district must act when a report is made, as follows:

> **NOTICE OF REPORT** Any District supervisor who receives a report of prohibited conduct shall immediately notify the appropriate District official listed above and take any other steps required by this policy.

> **INVESTIGATION OF THE REPORT** The District may request, but shall not insist upon, a written report. If the report is made orally, the District official shall reduce the report to written form.

> Upon receipt or notice of a report, the District official shall determine whether the allegations, if proven, would constitute prohibited conduct as defined by this policy. If so, the District official shall immediately authorize or undertake an investigation, regardless of whether a criminal or regulatory investigation regarding the same or similar allegations is pending.

> If appropriate, the District shall promptly take interim action calculated to prevent prohibited conduct during the course of an investigation.

---

[3] Kevin Brown had been the Title IX coordinator during the 2007-2008 school year, when Clark first reported sexual harassment.

9

The investigation may be conducted by the District official or a designee, such as a campus principal, or by a third party designated by the District, such as an attorney. When appropriate, the campus principal or supervisor shall be involved in or informed of the investigation.
. . .

**CONCLUDING THE INVESTIGATION** Absent extenuating circumstances, the investigation should be completed within ten District business days from the date of the report; however, the investigator shall take additional time if necessary to complete a thorough investigation.

**The investigator shall prepare a written report of the investigation. The report shall be filed with the District official overseeing the investigation.**

(Sec. Supp. CR 244; 268-69)

Clark first reported the sexual harassment to her immediate supervisor, Girls' Athletics Coordinator Boyer on October 18, 2017. (CR 329) According to the District's sexual harassment policy, Clark's report to Boyer complied with the requirements of the policy. (CR 425) Boyer should have immediately relayed Clark's report to the District's Title IX Coordinator. Instead, Boyer took no action.

On March 3, 2008, when Clark met with the Principal, Kershner, to go over her summative evaluation, Clark also told Kershner about the harassment. (Sec. Supp. CR 16, 246) Instead of following the District's policy and forwarding Clark's complaint to human resources or the Title IX coordinator, Kershner instructed Clark to seek counseling from Lucas, the campus wellness counselor, or from an outside provider used by the District. (CR 238, 340) Clark reported the sexual harassment to

10

Lucas as well. (Sec. Supp. CR 211) But just like Kershner and Boyer, Lucas failed to relay Clark's report to the District administration or Title IX coordinator.

After several verbal reports were ignored in violation of the District' policy, on May 14, Clark submitted an additional written complaint to Kershner, as described above, outlining numerous instances of sexual harassment as well as other retaliatory and harassing conduct by Monterrubio and Boyer. (CR 328-41) Kershner immediately responded with hostility and resentment, complaining that Clark had taken too long to write the report, even though Kershner had given her no time restrictions and had previously been informed of the harassment and done nothing.

Under the policy, Kershner should have reported Clark's complaint to the Superintendent, Dr. Christian, or to Kevin Brown, who was head of Human Resources and Title IX coordinator at the time. (Sec. Supp. CR 268) Instead of formally handling Clark's protected report under the District's policy, Kershner took it upon herself to conduct her own investigation.[4] (CR 425-426) According to the policy, the investigation should have been conducted by "the district official or designee, such as a campus principal." (Sec. Supp. CR 269) There is no documentation that either Christian or Brown designated Kershner to conduct the

---

[4] The District produced no documentation of Kershner's reporting the complaint to Brown or Christian. The only evidence is Bashara's testimony that she "knew how the district handled things in the past" even thought she was not working for the District then (CR 425-26) and Kershner's testimony that "it would be typical for me to share something like this with [Brown]." (CR 243) Kershner testified she was not aware of any written documentation showing she provided Clark's report to Brown or any written communications with human resources regarding the complaint or her investigation. (CR 243-44)

11

investigation. (CR 426) Moreover, Kershner admitted she is not qualified to conduct such an investigation as she has never done it before. (CR 246) As to who should have conducted the investigation and why, Bashara testified as follows.

Q. (BY MR. PEARSON:)
You want -- and when you have a serious complaint of harassment you want the investigation to be independent, true?
A. Sure.
Q. Because if it is not independent, chances are it's not going to be a thorough and accurate investigation, correct?
A. Sure.
Q. And as you said just a bit ago, that's one of the reasons why you get a high level administrator involved, because they would hopefully have that independence; would you agree with that?
A. Sure.
Q. And you also want someone that conducts the investigation that's qualified to conduct the investigation; would you agree with that?
A. I do agree with that, and I do feel that Stephanie Kershner is qualified.
. . .
Q. (BY MR. PEARSON:) You have no firsthand knowledge of what Stephanie Kershner did in her investigation, do you?
A. I do.
Q. No, you only know after the fact, true?
A. I'm sorry. You're correct. I do know after the fact. I looked at her notes.
Q. At the time this investigation was allegedly going on you were at home with your children?
A. You're right.

(CR 427)

12

According to Kershner's testimony, her "investigation" consisted of merely interviewing the accused harassers, Monterrubio, Boyer, and four other members of the athletic department staff. (CR 244) Clark's report had listed several individuals that she suggested someone interview, but Kershner did not follow up on that suggestion. (CR 340) On May 20, 2008, Kershner sent an email to Clark, Boyer, and Monterrubio, instructing them not to communicate with each other. (CR 383) On May 23, 2008, Kershner allegedly finished her investigation and wrote a letter to Clark stating that she "currently ha[d] no evidence supporting the details of your experiences and perceptions." (Sec. Supp. CR 235-36) According to the policy, a written report of the investigation should have been filed with the district official overseeing the investigation. (Sec. Supp. CR 269) Bashara, a custodian of human resources source records for the District, confirmed that there is no evidence that an investigative report was filed as required and that the first time she personally saw Clark's written complaint was after Clark filed her charge of discrimination to the EEOC. (CR 428)

Kershner testified that the complaints made by Clark in the letter dated May 14, 2008, if true, would violate the District's sexual harassment policy. (CR 252-53) Kershner testified that the emails sent to Clark by Monterrubio and complained of by Clark in the letter dated May 14, 2008 were against the District's sexual harassment

13

policy.[5]   (CR 253; See the subject emails at 290-324)   However, in her report, Kershner scolded Clark and placed the responsibility on Clark to prevent further harassment in the future.

> Q. All right. But putting that aside, as far as
> the e-mails, you felt while you admitted a little while
> ago that they were inappropriate under Alamo Heights'
> harassment policy, you believe you effectively responded
> to them by telling Ms. Monterrubio not to send them
> anymore?
> A. Right. That was my opportunity to tell her
> that that was inappropriate.
> **Q. And then you say in your next paragraph, "In
> the future you need to be proactive in your
> communication about complaints. From this day forward,
> you need to first address your concern with that
> individual, then file a grievance if it is not
> resolved." Did I read that correctly?
> A. Yes.
> Q. So basically if she feels there's an issue
> again with Ms. Monterrubio, she should approach her
> first, and if that's not -- she can't resolve it, then
> she should file a grievance?
> A.  That's what that states.**

(CR 253)

In her letter written on May 23, 2008, Kershner admonished Clark for not reporting the harassment earlier and insisted that the District's grievance policy required reporting an "incident" within ten days.  (Sec. Supp. CR 235)  However, the policy has no such limitation.   Bashara testified that the policy did not require

---

[5] Kershner's testimony contradicts her affidavit dated March 6, 2009 in which she testified, "I found that none of the e-mails, either individually or collectively, constituted sexual harassment as defined by policy or my understanding of the law."  (Sec. Supp. CR 295-96, Kershner Aff. at ¶ 7)

14

reporting harassment or retaliation within a certain time limit and that Kershner would be unjustified in criticizing Clark for not reporting instances of retaliation within the 10-day time period.  (CR 428, 430, 438)

Without conducting a legitimate investigation or reporting Clark's complaint to the Superintendent, Kershner incorrectly determined that there was no evidence of harassment.  Kershner also did not file a written report with any District official.

**2008-2009 School Year**

When Clark returned to school in August of 2008, the harassment by Boyer and Monterrubio continued.  (Sec. Supp. CR 17 at ¶ 6; CR 326-27)  On August 26, 2008, Clark met with Kershner and district athletic director, Gene Phillips.  Instead of addressing Clark's complaints of sexual harassment, they began to impose restrictions on her that were not imposed on other teachers or district employees.  For example, Clark was told that she could no longer bring her children to the school.  (Sec. Supp. CR 17 at ¶ 7; CR 326-27)

On September 11, 2008, Clark again met with Kershner and Phillips.  During this meeting, Clark voiced her opinion that her May 2008 report of harassment had just been swept under the rug by Kershner.  (Sec. Supp. CR 248-49)  According to Kershner's own letter, Clark stated, "Why should I share anything now because you won't do anything about it?"  (Sec. Supp. CR 248-49)  Clearly, Clark felt that any further reports of harassment would be futile, and Kershner never followed up to

15

prove her wrong. Kershner mentioned the meeting to Bashara, but Bashara never sought to reassure Clark that any reports would be taken seriously. (CR 419, 429)

In addition to the many incidents of harassment discussed above, Clark testified about additional harassment by Monterrubio in the 2008-2009 school year.

> Q. Okay. Now, you told her that you didn't want
> to listen to the profanity. What exactly profanity
> was directed at you and by whom?
> A. Annie would say something to Michelle across
> the room with me sitting between them. Things like I
> wonder if Coach Clark swallows.
> Q. What else?
> A. Some people know how to fucking dress.
> Q. Did you say dress?
> A. Yes, sir.
> Q. Okay. What else?
> A. Comments made in the office by Annie saying
> she thought were cute. One of them, it's like a
> Viagra commercial.
> Q. What did she say?
> A. She said it on several occasions. "If you
> have an erection lasting longer than four hours, don't
> call a doctor. Call me."

(Sec. Supp. CR 195) Monterrubio also talked openly about blow jobs in the athletic office where Clark was trying to work. (Sec. Supp. CR 195) She talked about Clark's body parts, saying, "Let's name the dimples in Clark's ass." (Sec. Supp. CR 195) Monterrubio talked about Clark's breasts almost every day. (Sec. Supp. CR 195) Monterrubio asked Clark if she "got any" over a holiday break. (Sec. Supp. CR 196) Monterrubio talked about "menage a twat," a play on words that she thought was funny. (Sec. Supp. CR 196) Monterrubio embarrassed Clark in front of everybody

16

about a specific sexual act, taunting, "Hey, Clark, you don't know what a tea bag is." (Sec. Supp. CR 196) Monterrubio once announced that she had used Clark's razor (which was stored in her locker in the staff bathroom) to shave her "pussy." (Sec. Supp. CR 196) Monterrubio regularly used profanity in the athletic office, sometimes directed at Clark, including the terms *shit*, *fuck*, *dick*, *cock*, *cocksucker*, and *fucker*. (Sec. Supp. CR 196-97) In Clark's presence, Monterrubio talked about her to the male coaches, making fun of Clark's clothing, skin, and sex life and saying that Clark should "hook up" with some of the male coaches. (Sec. Supp. CR 212)

Instead of addressing Clark's complaints of harassment, the District began to retaliate against Clark. The retaliation intensified after Clark filed a formal charge of discrimination with the EEOC in October 2008. (CR 325) The EEOC Charge was mailed to the District on October 17, 2008. Kershner testified that she was probably informed of the charge within a few days after the District received the charge. (CR 258) In response to the charge, Kershner warned Clark that her complaints would have consequences.

> Q. Did Stephanie Kershner ever directly tell
> you or state that she wished to propose your
> termination because you complained specifically about
> sexual harassment?
> A. Not exactly.
> Q. And what did she exactly do?
> A. She told me there would be consequences for
> my complaints.

(Sec. Supp. CR 304)

Kershner's words were indeed prophetic. On October 29, 2009, within days of receiving the EEOC Charge, Kershner placed Clark on an intervention plan, referred to as the Teacher in Need of Assistance ("TINA") Plan. (Sec. Supp. CR 237-38) Kershner testified that the bases for the TINA plan were generally ineffective communications with co-workers and alleged violation of the sexual harassment policy for not reporting her allegations within ten days. (CR 260) Placing Clark on a TINA was clearly unjustified and in retaliation for her filing an EEOC charge. The District's Director of Human Resources, Dana Bashara essentially admitted that the TINA was not appropriate. (CR 431)

> Q. So if all of Catherine's complaints in the fall
> of 2008, are either sexual harassment or retaliation, it
> is inappropriate to put her on a growth plan for failing
> to follow DGBA, correct?
> A. Correct.
> Q. And when -- the other portion of this
> intervention or growth plan about professional
> communications, is that professional communications with
> Annie Monterrubio and Michelle Boyer, or does it involve
> other people?
> A. My recollection is it's specifically regarding
> Michelle Monterrubio.
> Q. Annie Monterrubio?
> A. I'm sorry. Michelle Boyer and Annie
> Monterrubio.
> Q. All right.
> A. And also with the principal, with Stephanie
> Kershner.
> **Q. All right. Now, if it turns out that Annie**
> **Monterrubio and Michelle Boyer are harassing and**
> **retaliating against Catherine, do you think it's fair to**
> **be critical of Catherine for not communicating with**
> **them?**

18

**A. If there was evidence that either one of them was harassing Catherine it would not be fair to be critical of Catherine, but there was no evidence at this time that they were.**

. . .

(CR 431)

On January 8, 2009, Clark was observed and evaluated while teaching a physical education class by the assistant principal, Georgia Franks. Franks rated Clark's performance as "exceeds." (CR 405-12)

**Clark's FMLA Leave**

Due to health problems stemming from the stress she was experiencing due to the sexual harassment and retaliation, Clark went on FMLA leave beginning February 17, 2009. (Sec. Supp. CR 224-26) Just prior to Clark's leave, Bashara told her to find a substitute, and Clark selected Gabriela Jordan, whom she had used before and whom she knew to be capable. (CR 386-87) Clark gave Jordan detailed instructions regarding lesson plans and classroom management. (CR 386-87) The substitute worked one day, and Kershner told her to not return.[6] (CR 386-87) Kershner replaced the sub with Coach Debra Cathey, a friend of Monterrubio and Boyer. (See CR 384-85) Cathey had an incentive to badmouth Clark because she was trying to get

---

[6] There is no indication Kershner secured a substitute teacher in advance, nor did she voice any particular criticism of Jordan. (CR 281; see CR 384-85) Strangely, Kershner released Jordan a full week before Cathey could even begin the assignment. Thus the students had four substitute teachers during the first six days of Clark's leave. (Sec. Supp. CR 259-61)

19

a job at the district (CR 281) and because she was a personal friend of both Monterrubio and Boyer.[7]

On April 15, 2009, Clark filed a formal grievance against Monterrubio and requested that either she or Monterrubio be removed from the workplace. (Sec. Supp. CR 239-41) The District did not investigate Clark's complaints. Instead they used it as a witch hunt to get rid of her.

Near the end of April, 2009, Bashara allegedly took over the investigation of Clark's complaints. (CR 438) However she did not investigate Clark's complaints, she investigated Clark.

> Q. (BY MR. PEARSON:) My question to you is you
> never interviewed Catherine about her complaints, did
> you?
> **A. I did not specifically interview Catherine
> about her complaints**.

(CR 442) According to Bashara, there were no parent or student complaints against Clark. (CR 438) Likewise, there were no formal teacher complaints other than the grievances filed by Boyer and Gonzales (which were determined to be unfounded.) (CR 438, 266; Sec. Supp. CR 245) Nevertheless, Clark was placed on administrative leave on May 1, 2009 and ultimately terminated.

Georgia Franks, the assistant principal, had conducted Clark's classroom observation in early 2009. It was customary for the same administrator to conduct

---

[7] Bashara testified she was aware of the allegation that Cathey was a personal friend of both Monterrubio and Boyer, but she did not check to determine if it was true. (CR 435)

the [mid-year] evaluation and the annual evaluation. (CR 234). Thus, Franks should have conducted Clark's annual evaluation at least three weeks prior to the end of the school year. (CR 234) However, Kershner took it upon herself to conduct Clark's annual review instead of Franks and prepared it several weeks after school ended instead of before. (CR 391-404) Kershner even removed Franks' name from the document entirely. (CR 357-64) Kershner seemed to disregard Franks' evaluation completely, marking on the Local Performance Appraisal that Clark failed to score an "[Exceeds Expectations] in four of eight [domains], two of which must be in Domain I-IV," when Franks had, in fact, scored Clark as Exceeds Expectations in Domains I-IV. (CR 364; See also Clark's rebuttal at CR 365-71) Kershner conducted the biased annual evaluation in order to support Clark's wrongful termination.[8]

**Termination Process**

On June 23, 2009, Kershner recommended Clark's termination in a letter to Superintendent Kevin Brown. (Sec. Supp. CR 227-34) Brown did not conduct any independent investigation, but instead adopted Kershner's recommendation without question. Brown mailed a letter to Clark on June 24, 2009, the day after Kershner gave him her recommendation and just one day prior to the board meeting at which he recommended Clark's termination. (CR 377) Clark's termination was based entirely on Kershner's recommendation. (CR 377) On June 25, the AHISD Board of

---

[8] On June 30, 2009, Catherine submitted a Teacher Rebuttal to 2008-2009 Professional Development & Appraisal System: Summative Annual Appraisal dated June 18, 2009. (Sec. Supp. CR 17 at ¶ 9; CR 365-71) She has never received any response to her rebuttal. (Sec. Supp. CR 17 at ¶ 9)

Trustees met and received and accepted Brown's recommendation to propose the termination of Clark's employment contract. (CR 378-80) On August 14, 2009, The District informed Clark that her teaching contract was terminated. (CR 381)

The District asserts that Clark did not dispute any of the reasons given or alleged conduct cited in support of her proposed termination. This is inaccurate. Clark disputed the reasons several times in correspondence to Kershner. (*See for example* CR 389-90) The notes taken by Bashara during her May 28, 2009 interview of Clark indicate that Clark denied each allegation. (CR 342-56) In her deposition testimony, Clark also denied every one of the performance-related reasons that AHISD gave for her termination. (Sec. Supp. CR 306-8, 319-20) Clark also challenged the termination directly with Brown. (Sec. Supp. CR 17 ¶ 8, 317-18; CR 376)

The District alleges that the Board of Trustees terminated Clark's employment solely because she did not request a due process hearing in which to dispute the reasons Kershner invented in order to terminate her. Clark wrote a letter to Superintendent Kevin Brown and also met with Brown to discuss her situation. (Sec. Supp. CR 17 ¶ 8, 317-18; CR 376) Brown's response indicated to Clark that the termination was a "done deal" and challenging it would be futile. (Sec. Supp. CR 202, 317-18) Clark testified as to the encounter with Brown as follows:

> Q. (BY MR. SCHWARTZ:) Your testimony is you thought that this
> letter actually terminated you?
> A. No, I'm not saying that.

22

Q. Well, what are you saying then?
A. I just -- I knew they were going to fire me.
Q. You knew it in your head, but I'm asking you
if you have any evidence that they were going to fire
you.
MR. PEARSON: Other than the letter?
Q. (BY MR. SCHWARTZ:) Other than the letter.
A. Yes, sir.
Q. **What evidence, not speculation?**
A. **I had a meeting with Kevin Brown before this
and I brought in a letter to him and read it to him
and he said that the board would most likely terminate
me and I said "When will I know" and he said "Pretty
much immediately."**

(Sec. Supp. CR 202)   Furthermore, the district's termination policy did not require that Catherine participate in a due process hearing.

Monterrubio was reported by several individuals for her sexual conduct. Three female coaches complained of her sexually harassing conduct. In addition to Clark's reports of sexual harassment by Monterrubio, Jackie Moore made a complaint about Monterrubio's sexual behavior in April 2009. (CR 445)   Moore reported that Monterrubio told her about a conversation she had with two male coaches. (CR 446) According to Bashara, Monterrubio also violated the ethics code by telling the men and Jackie Moore that Clark was suing her for sexual harassment because she had stared and made comments about Clark's butt and breasts. (CR 446)   Monterrubio went on to tell the male coaches and Moore that Moore's "fake boobs" were more desirable than Clark's. (CR 446)   Brittany Duncan made a similar report in April 2009 about Monterrubio's talking about her breast implants. (CR 445-46)   In April 2009,

23

two male coaches, Brian Narvaez and John Hanna, reported inappropriate sexual comments made by Monterrubio during athletics class and in the presence of students. (CR 446) At least one student interviewed by Kershner reported that Monterrubio talked about her personal life loudly enough for her to hear, including "that she and Coach Boyer were out at a bar and that they were drunk." (Sec. Supp. CR 258)

At least one parent, Patricia Davis, complained of Monterrubio in a written report to Dr. Kevin Brown dated May 7, 2008. (Sec. Supp. CR 264-65) The parent complaint states, in part, that Monterrubio called girls "quitters" and "racists," said "shut up," "damn," and "crap" to them, and used profane language such as "what the hell" and "that sucks" at games. (Sec. Supp. CR 264-65) The parent also noted that Monterrubio was overheard by many students talking about sexual intercourse in her personal life, saying rude things behind other coaches' backs, making inappropriate gestures toward her colleagues, and badmouthing the administration by criticizing the way the school was run. (Sec. Supp. CR 264-65) Bashara testified that if the parent's allegations were accurate, they would violate the ethics code and the District's harassment policy. (CR 447) Bashara also testified that she was not aware whether any investigation was done into the parent's allegations against Monterrubio and that she did not have any personal knowledge that Kershner did any investigation of the allegations made by Ms. Davis. (CR 447) Furthermore, Bashara testified that she was not aware of any file that reflected that the human resources department did any sort

of investigation of allegations of improper conduct or sexual conduct against Monterrubio made by any employees, parents, or students. (CR 447)

In spite of the numerous complaints and negative evaluations against Monterrubio, there is no documentation that she was disciplined in any way. (CR 264, 449) When Monterrubio was reassigned to work at the high school for the last few weeks of the school year, she was not demoted, suspended, or put on leave. (CR 449) Monterrubio did not lose any pay or benefits. (CR 264) Monterrubio was even allowed to return to work at the Junior School for the following school year. (CR 264)

Bashara testified that she was not aware of any other employees besides Clark who were terminated for repeated failure to work cooperatively with colleagues, for repeated failure to maintain effective working relationships and good rapport with colleagues, or for causing disruptions in the workplace and teaching environment. (CR 450) Bashara did know of other teachers being put on a growth plan for disruption to the workplace and teaching environment and for diminished effectiveness as a teacher, and she thought one person prior to Clark might have been terminated for diminished effectiveness as a teacher. (CR 450) She was aware of other teachers who had been disciplined for violating the Texas Educator Code of Ethics, but she was not aware of any of them had been terminated. (CR 450) Bashara was aware of other teachers being put on growth plans for repeated failure in their performance of their duties, but she was not sure if anyone had been terminated

25

for that reason. (CR 450) Bashara was aware of other teachers being disciplined for insubordination, and she thought someone might have been terminated for that reason in or around 1999. (CR 450-51) Bashara was aware of another employee who had been disciplined for repeated and continuing failure to comply with board policies, administrative regulations, procedures and directives, but no one besides Clark had been terminated for that reason. (CR 451) She was not aware of any other employees who had been disciplined for false reporting in an official district investigation. (CR 451)

In October 2008, Clark filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission. (CR 3) Clark's charge asserted claims of sex discrimination. Clark received a notice of right to file a civil action within 60 days of filing this lawsuit.

## SUMMARY OF THE ARGUMENT

The District's plea to the jurisdiction is based on four arguments: (1) that its sovereign immunity is only waived as to TCHRA claims where the claimant has alleged a *prima facie* case of violation of the TCHRA; (2) that the *McDonnell Douglas* burden-shifting framework requires a showing of pretext and must be considered a part of the jurisdictional analysis under *Mission Consolidated*; (3) that Clark failed to allege a *prima facie* case of discrimination; and (4) that Clark failed to allege a *prima facie* case of retaliation.

26

Clark will show that the Court should affirm the denial of the District's plea for any or all of the following reasons: (1) Clark has alleged a *prima facie* case of both discrimination and retaliation and therefore the District's sovereign immunity is waived under the TCHRA; (2) Clark has plead and supported with evidence a *prima facie* case of both discrimination and retaliation; (3) a showing of pretext is not part of Clark's *prima facie* burden under *McDonnell Douglas*; and (4) Clark exhausted her administrative remedies and collateral estoppel does not apply to this case. Clark's pleading alleges *prima facie* facts to support her claims of sexual harassment and retaliation to meet the TCHRA, and the deposition excerpts and other evidence submitted to the trial court overwhelmingly show that Clark can and has met her *prima facie* burden. Thus, the District's sovereign immunity is waived as to Clark's TCHRA claims, and the plea was properly denied.

## ARGUMENT AND AUTHORITIES

I.    **BECAUSE CLARK ALLEGED A PRIMA FACIE CASE OF BOTH DISCRIMINATION AND RETALIATION, SOVEREIGN IMMUNITY IS WAIVED UNDER THE TCHRA.**

Political subdivisions of the State of Texas such as the District are not immune from suit under the TCHRA if the claimant has alleged a *prima facie* case that the agency has violated the TCHRA. "[T]he TCHRA clearly and unambiguously waives immunity" for suits brought against state agencies "for those suits where the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012).

27

Appellant would have the court believe that a plea to the jurisdiction is exactly the same as a motion for summary judgment except for one characteristic, that the denial of a plea to the jurisdiction may be challenged in an interlocutory appeal. To the contrary, a plea to the jurisdiction is a dilatory plea, the purpose of which is generally to defeat an action "without regard to whether the claims asserted have merit." *Mission Consol.,* 372 S.W.3d at 635. Generally, in deciding a plea to the jurisdiction, the Court is not to weigh the merits of the plaintiff's claims but must consider the plaintiff's pleadings, construed in the plaintiff's favor, and evidence pertinent to the jurisdictional inquiry. *Lueck v. State*, 325 S.W.3d 752, 754 (Tex. App. – Austin 2010, no pet.)(citing *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002)).

There are two means by which a governmental entity could challenge jurisdiction in this context. First, without evidence, the defendant could challenge the sufficiency of the facts alleged in the petition to state a *prima facie* case that falls within the TCHRA. *Hs Tejas v. City of Houston*, No. 01-13-00864-CV, 2015 Tex.App.LEXIS 2136, 5 (Tex. App. – Houston[1st Dist.] March 5, 2015, no pet. f.). Second, if a *prima facie* case is pled, the defendant could support the plea with its own evidence challenging the facts of *prima facie* case, which – as to only those issues in the *prima facie* case the defendant produced controverting evidence in its plea – the plaintiff would respond by producing evidence raising a fact issue as she would in a traditional summary judgment. *Id.*

28

At trial on in responding to a motion for summary judgment on a retaliation claim, under the *McDonnell Douglas* burden shifting framework, once the plaintiff establishes a *prima facie* case, the burden of proof shifts to the defendant to produce a legitimate non-retaliatory reason for the plaintiff's termination. *Id.* Once the employer makes this showing, in order to prevail at trial or avoid summary judgment, the plaintiff must show that the employer's reason is pretext. *Id.* However, proving pretext is not an element the *prima facie* burden under the TCHRA and is therefore not considered in determining the merits of the District's plea to the jurisdiction. *Rosenberg v. KIPP, Inc.,* No. 14-13-00969-CV, 2015 Tex. App. LEXIS 811, at *14-15 (Tex. App.—Houston [14th Dist.] Jan. 29, 2015, no pet.).

Thus, the District misunderstands the scope of the plea to the jurisdiction analysis. A plaintiff in a TCHRA case invokes the statute's waiver of immunity and shows that the trial court has subject matter jurisdiction by establishing each of the elements of a **prima facie** TCHRA case "by pleading facts that state a claim thereunder." *Mission Consol.*, 372 S.W.3d at 636. The Court only reaches the merits of a plaintiff's claims to the extent necessary to resolve the dispute over jurisdictional facts, identified by the Texas Supreme Court as the elements of a *prima facie* case of employment discrimination. *See Fort Bend Indep. Sch. Dist. v. Williams*, No. 01-13-00052-CV, 2013 Tex. App. LEXIS 11428, at *3 n.4 (Tex. App.—Houston [1st Dist.] Sept. 5, 2013). Thus, at this stage, the Court is only interested in the sufficiency of Plaintiff's *prima facie* case, not the Plaintiff's ultimate burden to prevail at trial and not

29

any issue that would be the defendant's burden, like the validity of a non-discriminatory reason.

The District argues that in order to establish subject matter jurisdiction on her retaliation claim, plaintiff must show that the District's proffered reason for her termination is pretext for discrimination. Appellant confuses the burden of proof, arguing that Plaintiff must go beyond the *prima facie* case and instead prove her entire case in order to establish jurisdiction. Appellant reasons, "[t]his is a logical **extension** of the Texas Supreme Court's rationale in *Mission Consolidated*." (Appellant's Br. 34 (emphasis added)). However, the plaintiff in *Mission Consolidated* failed to prove one element of her *prima facie* case of age discrimination, so the Court did not address whether she must show her employer's reason for her termination was pretext for discrimination. *Mission Consol.*, 372 S.W.3d at 642-43. By asking the Court to consider its pretext argument, the District is asking the Court to consider facts and evidence beyond Clark's "minimal" burden of establishing her *prima facie* claim. *KIPP, Inc. v. Whitehead*, 446 S.W.3d 99, 112-13 (Tex. App.—Houston [1st Dist.] 2014, pet. filed).[9]

Defendant also fails to recognize a significant step in the Court's analysis of this type of plea. In situations where a plea to the jurisdiction challenges the existence of jurisdictional facts, **the defendant initially carries the burden** to meet the summary judgment proof standard of negating one of those jurisdictional facts.

---

[9] As explained in section III(F), infra, Clark demonstrated facts and evidence to show pretext even though she was not required to do so at this procedural stage of the case.

*Mission Consol.*, 372 S.W.3d at 635, 637; *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). The *Miranda* court reasoned that by requiring the state to clear this initial evidentiary hurdle in cases like this one, "we protect the plaintiffs from having to 'put on their case simply to establish jurisdiction.'" *Miranda*, 133 S.W.3d at 228 (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000)). **Only if Defendant meets the summary judgment proof is the Plaintiff then required to show that a disputed material fact exists** regarding the jurisdictional issue.[10]  *Miranda,* 133 S.W.3d at 228. This does not mean Plaintiff is required to marshal evidence and prove her claim to satisfy this jurisdictional hurdle. *Lueck*, 290 S.W.3d at 884. In other words, while Clark must plead the elements of her statutory cause of action—here the basic facts that make up the *prima facie* case – so that the court can determine whether she has sufficiently alleged a TCHRA violation, she will only be required to submit evidence if the defendant presents evidence negating one of those basic facts. *See Miranda*, 133 S.W.3d at 228; *Mission Consol.*, 372 S.W. 3d at 635, 637. Since the District failed to meet this burden, the district court was correct in denying the plea to the jurisdiction.

Thus, the only question necessary to address in order to resolve the legal issue of the District's sovereign immunity is whether Clark alleged facts stating a claim under the TCHRA. Clark has clearly alleged facts that establish a *prima facie* case of

---

[10] In *Tex. State Office of Admin. Hearings v. Birch*, this Court made clear that it first determined that Defendant offered evidence negating one element of each of Plaintiffs' claims before examining each Plaintiff's evidence. *Tex. State Office of Admin. Hearings v. Birch*, No. 04-12-00681-CV, 2013 Tex. App. LEXIS 9065 (Tex. App.—San Antonio Jul. 24, 2013, pet. denied).

both sexual discrimination and retaliation in violation of the TCHRA, and therefore the District must present summary judgment type evidence negating one of those jurisdictional facts before Clark is required to submit evidence.

Even if the Court determines that Clark is required to submit evidence, her burden of proof with respect to those jurisdictional facts must not "involve a significant inquiry into the substance of the claims." *Lueck*, 290 S.W.3d at 884 (citing *Bland*, 34 S.W.3d at 554). When evidence has been submitted to support the plea that implicates the merits of the case, **the Court must take as true all evidence favorable to the nonmovant, Clark, and must indulge every reasonable inference and resolve all doubts in Clark's favor**. *Miranda*, 133 S.W.3d at 227-28. As Plaintiff, Clark simply has to demonstrate a disputed material fact question on the jurisdictional facts only. *Id.* at 228. *See Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000); *Phan Son Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999). In this way, the Plaintiff's burden in overcoming a plea to the jurisdiction is much lower than that required to overcome a summary judgment.

If a fact issue exists, the trial court should deny the plea to the jurisdiction. *Miranda*, 133 S.W.3d at 227-28. Clark's pleading and the evidence submitted are clearly more than enough to support a *prima facie* case of both unlawful discrimination and retaliation.

**II. CLARK ALLEGED A PRIMA FACIE CASE OF DISCRIMINATION ON THE BASIS OF SEX.**

Clark alleges she was subjected to discrimination on the basis of her sex in violation of Section 21.051 of the TCHRA. TEX. LAB. CODE §21.051. Under the *McDonnell Douglas* burden-shifting framework, if the plaintiff meets the "minimal" initial burden of establishing a *prima facie* case of discrimination, she is entitled to a presumption of discrimination. The Plaintiff's burden at the *prima facie* stage of the case "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). And once pled, the *prima facie* case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

Clark's pleadings contain facts to support all elements of hostile work environment sexual harassment which are: (1) plaintiff is a member of a protected class; (2) subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Green v. Indus. Specialty Contractors, Inc.*, 1 S.W. 126, 131 (Tex. App. – Houston [1st Dist.] 1999, no pet.). When, as in this case, the alleged harassment was perpetrated by a supervisor with immediate or successively higher authority, a plaintiff need only satisfy the first four elements set forth above.

33

*Celestine v. Petroleos de Venezuela S.A.*, 266 F.3d 343, 353 (5th Cir. 2001). One of Clark's harassers, Michelle Boyer, was her immediate supervisor. However, the District contends Boyer was not Clark's supervisor and asserts that Clark cannot establish the third, fourth, and fifth elements of her *prima facie* case.

### A.  The same-sex harassment perpetrated by Monterrubio and Boyer was gender based.

Clark was harassed on the basis of her sex. The District argues that Clark must prove that the same-sex sexual harassment perpetrated by Monterrubio and Boyer was based on sex by proving one of the three evidentiary methods described in *Oncale*. The *Oncale* Court stated:

> Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual. But harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, **for example**, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace. A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. **Whatever evidentiary route** the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimination . . .* because of . . . sex."

34

*Oncale v. Sundowner Offshore Svcs.,* 523 U.S. 75, 80-81 (1998)(emphasis added). While *Oncale* gives examples of how one might prove that harassment was because of sex, it is not expressed as an exhaustive list.

The Court in *City of San Antonio v. Cancel*, 261 S.W.3d 778 (Tex. App.—Amarillo 2008) construed the above passage from *Oncale* as "identifying examples of 'evidentiary route[s]' by which a plaintiff could prove this element of its sexual harassment claim." The Fifth Circuit agreed that these three routes are not the exclusive paths to success on a [Title VII] same-sex harassment claim. *EEOC v. Boh Bros., Constr. Co., L.L.C.*, 731 F.3d 444 (5th Cir 2013)(holding that the EEOC could rely on evidence that the harasser viewed plaintiff as insufficiently masculine to prove its claim). Other circuits have come to similar conclusions. *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999); *James v. Platte River Steel Co.*, 113 F.App'x 864, 867 (10th Cir. 2004); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2001).

In this case, Monterrubio and Boyer harassed Clark on the basis of sex. They were physically attracted to Clark, making it clear that they noticed and admired her breasts and buttocks. Although not all of their harassing conduct was sexual in nature, it was all because of Clark's gender, their attraction to her, and the fact that she did not reciprocate that interest. Throughout the time Clark worked with Monterrubio and Boyer, they continued to make frequent sexual remarks to her and about her and her female body parts. They also exhibited aggressive and intimidating

35

behaviors toward Clark which can be sexually motivated just as overtly sexual conduct can be – and here they are alleged to have been motivated by sex and Clark's gender.

**B. The Harassment was sufficiently severe or pervasive as to alter the conditions of Clark's employment and create an abusive working environment.**

Harassment alters a term, condition or privilege of employment when a reasonable person would find that the harassment created an abusive working environment. This is accomplished by showing conduct "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 806 (Tex. 2010). An abusive environment arises "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult.'" *Id.* Courts look to all the circumstances in determining whether a hostile work environment exists, including the frequency of the discriminatory conduct and whether it unreasonably interfered with the employee's work performance. *Id.* In order for harassment to be "actionable under [statute], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that a victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "Whether an environment is hostile or abusive depends on the totality of the circumstances, including factors such as the frequency of the conduct, its severity, and the degree to which the conduct unreasonably interferes with an

36

employee's work performance." *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005). The Fifth Circuit described the fourth prong of the test.

> An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment. *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 434-35 (5th Cir. 2005). The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of "pervasive," thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists. Thus, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir. 1991).

*Lauderdale v. Tex. Dep't of Crim. Justice,* 512 F.3d 157 (5th Cir. 2007). Clark was subjected to harassment that was continual, serious, pervasive and severe. Furthermore, the harassment interfered with her opportunity for success in the workplace.

On or about May 15, 2008, Clark formally reported a litany of harassing behaviors to both Boyer and Kershner. These were not isolated incidents of innocent joking. The harassment was a repeated pattern of sexual comments, humiliating jokes and comments about Clark's breasts and buttocks, insults, ridicule, intimidation and humiliation. On one occasion, Boyer and Monterrubio even grabbed Clark's buttocks. This conduct was as extreme or pervasive as that detailed in many cases in which courts have found a hostile work environment. The District knowingly allowed the creation of a work environment specifically and pervasively hostile to women.

37

Clark certainly found the environment offensive, hostile, and abusive, as would an objective reasonable person.

Texas appellate courts have upheld jury findings of hostile work environment that are comparable or less egregious than the harassment against Clark. In *City of Laredo v. Negrete*, the court upheld a jury finding that Negrete was subjected to a hostile work environment by her supervisor who, over a ten-month period, called her on her cell phone multiple times, asked her out for dinner and drinks, sent her flowers at work, gave her unsolicited and unwelcome hugs, displayed for coworkers an image he created by superimposing her face on the image of a scantily clad woman, displayed a pornographic image on his computer, pretended to mount a female intern like a horse (conduct which Negrete did not see), made sexually suggestive comments, remarked about her beauty, talked about his sexual relations with other women, and appeared twice at her apartment. *City of Laredo v. Negrete*, No. 04-08-00737, 2010 Tex. App. LEXIS 903 (Tex. App.—San Antonio Feb. 10, 2010, pet. denied.).

In *Wal-Mart Stores, Inc. v. Itz*, the Court held that a reasonable jury could find that Itz was subjected to a hostile work environment when her coworker called her at home five times, complimented her legs and body, touched her on the lower leg on two occasions, suggested she break up with her boyfriend and allow him to support her, gave her cash, gave her an unwelcome and forceful hug, touched the hem of her skirt, and commented that her miscarriage might have been for the best because it was

38

not meant for her and her boyfriend to stay together. *Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456 (Tex. App.—Austin 2000, pet denied).

The District would have you believe that courts have consistently rejected the sexual harassment claims of plaintiffs who were subjected to more frequent and egregious conduct than that alleged by Clark. Contrary to the District's argument, the conduct or behavior does not have to rise to the level of constant groping or assault in order to be actionable.

The cases relied upon by the District are distinguishable from Clark's case. The District describes the harassment in *Gearhart* as being perpetrated by multiple co-workers and including multiple instances of physical contact, which is technically correct but artful. *See Gearhart v. Eye Care Centers of America*, 888 F. Supp. 814 (S.D. Tex. 1995). Gearhart was actually harassed by two co-workers and touched on three occasions. She was touched on her hair and on the side of her breast, and she was kicked on her buttocks. She was harassed for six weeks, and she returned to work for only one and one-half hour after reporting the harassment. While the harassment endured by Gearhart was certainly inappropriate, it does not compare to the unrelenting harassment focused on Clark over roughly twenty months.

The District compares Clark's case to *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871 (5th Cir. 1999) and *Hockman v. Westward Communs., LLC*, 407 F.3d 317 (5th Cir. 2004). Those two cases were later questioned by the Fifth Circuit for not applying the correct standard. *Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396 (5th

39

Cir. 2013)(emphasizing that the Supreme Court has made it clear that the standard is "severe **or** pervasive' as opposed to "severe **and** pervasive."); *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428 (5th Cir. 2005)(noting that the Supreme Court has stated that even isolated incidents, if egregious, can alter the terms and conditions of employment). Likewise, another case cited by Defendant, *Barnett v. Boeing Co.*, 306 Fed. App'x 875 (5th Cir. 2009), relies on the standard used in *Shepherd* and *Hockman*. While the *Barnett* Court stated the correct standard as "severe or pervasive," their reasoning downplayed the fact that Barnett was touched in sexually inappropriate and unwelcome ways.

The District also cites *Hale v. Napolitano*, No. SA-08-CV-106-XR, 2009 U.S. Dist. LEXIS 44723 (W.D. Tex. May 28, 2009) and *Hancock v. Barron Builders & Mgmt Co., Inc.*, 523 F. Supp. 2d 571 (S.D. Tex. 2007). Hale was subjected to continuous, repeated "filthy, sexist and obscene language and jokes in the workplace." *Hale,* No. SA-08-CV-106-XR at *3. In *Hancock*, the alleged harasser made over 100 sexually graphic, vulgar and offensive statements over nine months and frequently discussed his personal sex life with the plaintiffs. *Hancock*, 523 F.Supp. 2d at 576. In contrast, Clark was subjected to continuous repeated sexual jokes and obscene language, most of which were *directed at her*. Boyer and Monterrubio repeatedly made comments about Clark's body, clothing, and naiveté about various sexual practices. Their remarks were invasive, insulting, and humiliating, and Clark felt physically threatened

40

and reported to Kershner that she feared for her safety, so much so that she took FMLA because of the harassment.

### C. One of the Harassers, Michelle Boyer, was Clark's Supervisor.

Clark was sexually harassed by Anne Monterrubio and Michelle Boyer. At the time of the harassment, Boyer was the Girl's Athletic Coordinator and Clark's direct supervisor. In Clark's Second Amended Petition, Clark alleged that her supervisor, Michelle Boyer, made improper sexual comments to her. The District tries to minimize Boyer's role and argues that Clark's hostile work environment claim is about the alleged behavior of her co-workers, not her supervisor. However, documents and testimony support the conclusion that Boyer was Clark's direct supervisor.

Kershner continually told Clark to report any problems, concerns, or questions to Boyer, and Clark was required to follow Boyer's direction. Boyer was the Athletic Coordinator for the girls' physical education classes and the girls' teams. Kershner consistently referred to Boyer as Clark's supervisor. Boyer helped determine who would coach what sports and teams and helped set practice schedules. (CR 230) Coaches were encouraged to go to the Athletic Coordinator with any problem before going to an assistant principal or to the principal. (CR 230) In Kershner's letter to Clark regarding her investigation into Clark's May 2008 report of sexual harassment, she stated, "Your communication with your supervisors, including Michelle Land [Boyer], Georgia Franks, David MacRoberts, Gene Phillips and me has been inconsistent." (Sec. Supp. CR 235-36) In another letter to Clark, dated October 29,

41

2008, Kershner recalled a meeting on September 29, 2008 with Clark, Phillips, Monterrubio, and Boyer in which "We concluded that you should communicate these concerns with your supervisor, Michelle Boyer, who could handle issues such as these in the future." (CR 372-73) The same letter also stated that during an October 1, 2008, Michelle Boyer "clarified roles and responsibilities." (CR 373) In November 2008, when Clark asked Kershner if her children could catch the morning bus at the Junior School, Kershner deferred to Boyer's judgment, directing Clark to "consult with Michelle Boyer," who denied the request. (CR 382) Most tellingly, reports from Michelle Boyer were to be the criteria for Clark's successful completion of her TINA plan. (CR 374-75) Kershner put great weight on completion of the TINA plan, and making positive reports from Boyer the criteria for success placed Boyer in a position of influence over Clark's continued employment. Thus, Boyer was indeed Clark's supervisor, and therefore Clark needs not prove the fifth prong of the test.

## D. The District knew, or should have known of the harassment, was negligent in control of the workplace, and did not take prompt remedial action.

Even if the Court finds that Boyer was not Clark's supervisor, Clark can demonstrate a *prima facie* case that the District was negligent in controlling the working conditions by showing the fifth prong of the test, that the District knew, or should have known, of the harassment and did not take prompt remedial action. *Green*, 1 S.W. at 131.

42

The District had a written sexual harassment policy in place, but Clark's supervisors wholly failed to follow the policy. The policy allows an employee to make a complaint of harassment verbally or in writing to his or her supervisor or campus principal. Any District supervisor who received a report of prohibited conduct was required to immediately notify the appropriate District official listed in the policy and take any other steps required by this policy. Once a report was received, the District was required to conduct or authorize an investigation. The District disregarded its obligations on multiple occasions after receiving Clark's complaints of sexual harassment.

Clark reported sexual harassment by Monterrubio and Boyer to her supervisor, Michelle Boyer, for the first time on in Mid-October, 2007. Bashara testified that Clark's report to Boyer complied with the district's sexual harassment policy. However, Boyer never reported Clark's complaints to a District official as required by the policy. Clark next reported the harassment verbally to Kershner and Wellness Counselor, Lucas, in March 2008. Neither of them followed the District's policy to report the culprit to human resources. On May 15, 2008, Clark submitted a letter to Kershner detailing sexual harassment by Monterrubio and Boyer. Kershner testified that comments made by Clark in their meeting on May 12, 2008 and Clark's subsequent letter put her on notice that Clark was alleging sexual harassment. (CR 241-42) Furthermore, Bashara testified that the allegations in that letter should have

43

put the District on notice that Clark was alleging sexual harassment. (CR 423-24) Kershner again disregarded the District's policy.

As explained above, the District's policy stated that when a supervisor received a report of sexual harassment, it should be reported to a district official. There is no documentation that this happened. Then, according to the District's policy, the district official or designee was to conduct an investigation. There is no documentation that a district official designated Stephanie Kershner to conduct an investigation nor is there any evidence that Kershner is qualified to conduct an investigation. Kershner conducted a merely rudimentary investigation, interviewing only the accused harassers and other faculty members from their department who were likely to be biased. Following the investigation, Kershner took no action except to tell Monterrubio to stop sending vulgar emails using her district email account and to scold Clark for allegedly violating the grievance policy which did not even pertain to sexual harassment or retaliation.

## E. The District failed to conduct a meaningful investigation and take prompt remedial action based on its own policy.

As described in the Statement of Facts section, *infra*, the District failed to conduct a meaningful investigation or take prompt remedial action.

The District asserts that Clark made no further reports and did not appeal or file an EEOC charge until several months later. Kershner issued a report of her investigation on May 23, 2008, shortly before the end of the school year. During the

44

summer, Clark did not have regular contact with Monterrubio or Boyer, so although her next report of harassment was several months later, she had only worked with the harassers for about seven weeks before making another report.

Since Clark's petition alleges *prima facie* facts of sex discrimination, the Legislature has waived sovereign immunity for this suit under the TCHRA. *Mission Consol.*, 372 S.W.3d at 676.

## III.    CLARK ALLEGED A PRIMA FACIE CASE OF UNLAWFUL RETALIATION.

Clark likewise alleged a *prima facie* case of retaliation under section 21.055 of the TCHRA.   "[A]ctionable retaliation exists when an employer makes an adverse employment decision against an employee who voices opposition to conduct made unlawful under the [T]CHRA, regardless of whether the employee has already filed a formal complaint with the Commission." *Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802, 823 (Tex. App. – Houston [1st Dist.] 2012, no pet.)(*quoting City of Waco v. Lopez*, 259 S.W.3d 147, 152 (Tex. 2008)). *See also Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427-28 (5th Cir. 2000).  The elements of a *prima facie* case of retaliation are: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Ptomey v. Tex. Tech Univ.*, 277 S.W.3d 487, 495 (Tex. App. – Amarillo 2009, pet. denied).

45

**A. To overcome a Plea to the Jurisdiction, Clark is not required to show the District's articulated reason for her termination is pretext**.

Under the *McDonnell Douglas* burden-shifting framework, once Clark has established her *prima facie* case, she is entitled to a rebuttable presumption of unlawful conduct unless the District can articulate a legitimate non-discriminatory reason for the termination. *See Mission Consol.*, 372 S.W.3d at 634. The *McDonnell Douglas* Court held that at that point, the employee is afforded a fair opportunity to show that the employer's state reason was a pretext, but this step is **not** part of Clark's's *prima facie* case. *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 679 (1973). As discussed in Section I, *infra*, to overcome a Plea to Jurisdiction, Clark need only establish her *prima facie* case. *Mission Consol.*, 372 S.W.3d at 637-38. The District misstates Clark's burden, asserting that if the District articulates a legitimate non-discriminatory reason(s) for the termination, Clark must rebut each reason and show that they are merely pretext for retaliation. That would be Clark's burden at trial or Clark's burden in overcoming a summary judgment, but the District elected to file a Plea to the Jurisdiction instead of a Motion for Summary Judgment.

**B. Clark Engaged in Protected Activity.**

The District alleges that Clark's reporting sexual harassment to Kershner cannot be a protected activity because Clark could not have had a good faith reasonable belief that the same-sex harassment was based on gender. In this case, there is evidence establishing that Clark had both a subjectively and objectively

46

reasonable belief that the harassment by Monterrubio and Boyer was based on gender. Thus there is abundant evidence to support this element of Clark's *prima facie* claim.

During her deposition, Clark testified that she believed that Monterrubio's conduct and Boyer's conduct was sexual harassment. Kershner and Bashara confirmed that Monterrubio's conduct was the type of conduct that violated the District's Sexual Harassment Policy. Kershner testified that comments made by Clark in their meeting on May 12, 2008 and Clark's subsequent letter put her on notice that Clark was alleging sexual harassment. Furthermore, Bashara testified that the allegations in that letter should have put the District on notice that Clark was alleging sexual harassment. That Clark's report raised questions about the sexual harassment policy for both Kershner and Bashara also establishes that her belief was objectively reasonable. Thus, Clark's good faith belief that Monterrubio's conduct constituted sexual harassment in violation of the District's policy is supported by Kershner and Bashara, the very people involved in the investigation by AHISD.

The District states that a "good faith reasonable belief" standard includes both subjective and objective reasonable belief, and cites *Cox & Smith, Inc. v. Cook* as an example. The incidents of harassment reported in *Cox & Smith, Inc. v. Cook* were made in social settings in non-work hours. Furthermore, the only comments of a sexual nature that the accused directed at Cook were a joke about Hillary Clinton and his stating that he had previously thought she was having a sexual relationship with her former supervisor. *Cox & Smith, Inc. v. Cook*, 974 S.W.2d 217, 221; 227 (Tex.

47

App.—San Antonio 1998, pet. denied).  The harassment reported by Clark was far more egregious, pervasive, and occurred over a much longer time period.

The fact that Monterrubio and Boyer exhibited many of the same behaviors towards men in the workplace does not establish that the harassment of Clark was not based on gender.  To the contrary, Monterrubio and Boyer were vulgar in their interaction with the men, but they did not indicate that they were attracted to the men.  They did not make remarks to the men about their bodies as they did often to Clark.

**C.     There is a Causal Connection Between Clark's Termination and Her Reporting of Boyer and Monterrubio's Unlawful Conduct.**

As discussed above, Clark reported Boyer and Monterrubio's conduct verbally to Boyer and Lucas and both verbally and in writing to Kershner.  At the time Clark reported to Kershner, she had earned stellar performance evaluations at the Junior School and had never been disciplined in her twelve years of employment in schools.  However, once Clark reported sexual harassment, Kershner embarked on a campaign to discredit Clark and create a paper trail to support her eventual termination.

Even if the Court finds that Clark's letter to Kershner detailing the sexual harassment by Monterrubio and Boyer is not a protected activity leading to an adverse employment action, Clark also engaged in at least one clearly protected activity, filing a charge with the EEOC.  Within days of receiving Clark's EEOC charge, Kershner placed Clark on a TINA performance improvement plan, the device by which the

48

District ultimately terminated her. At that time, Kershner also began to find fault with Clark's every move, preparing a record to support a termination. Kershner took it upon herself to complete Clark's evaluation when Franks should have completed it. Kershner's evaluation of Clark was contrary to the mid-year evaluation done by Franks and contrary to all prior evaluations. Kershner did not complete Clark's evaluation until after the school year ended instead of three weeks before the end of the school year which was customary. The evaluation was written within days of Kershner's recommendation to Brown to fire Clark.

The District argues that Clark was fired because she did not request a hearing or contest the reasons proffered for her proposed termination. To the contrary, at that point, Kershner had recommended Clark's termination, Brown had accepted her recommendation without conducting any independent investigation, and Brown had indicated to Clark that challenging the termination would be ineffective. Furthermore, the District's policies did not require that Clark request a hearing. The Board could have conducted an independent investigation, but they chose to accept Brown's recommendation without doing so. Placing the blame on Clark merely because she did not request a hearing is ridiculous.

### D. Clark exhausted her administrative remedies, and collateral estoppel does not apply in this case.

The District argues that the doctrine of collateral estoppel bars Clark from re-litigating the Board's reasons for terminating her employment. Collateral estoppel

does not apply in this case. Clark has filed suit for claims under the TCHRA, Texas Labor Code § 21.001 *et. seq.*, and as such is not required to exhaust her administrative remedies under the education code. *Sharyland ISD v. Molina*, No 13-12-00625-CV, 2013 Tex. App. LEXIS 11908, at *7-8 (Tex. App.—Corpus Christi 2013); *Vela v. Waco Indep. Sch. Dist.*, 69 S.W.3d 695, 702 (Tex. App.—Waco 2002). As noted in *Austin Independent School District v. Lowery*, the Waco court:

> Explicitly rejected the dual-exhaustion requirement, holding that it was unnecessary for a school district employee 'to pursue two administrative schemes, one under the [labor code] and the other under the Education Code, before seeking relief in the courts." The holding in *Vela* was predicated on the court's determinations that (1) unlike the education code, the [labor code] contains specific statues that address discrimination by an employer; and (2) a school district employee's discrimination claim under the [labor code] does not pertain to the administration of school laws.

*Sharyland,* No 13-12-00625-CV at *7 (quoting *Austin Indep. Sch. Dist. v. Lowery,* 212 S.W.3d 827, 832 (Tex. App.—Austin 2006, pet. denied)(*disapproved on other grounds by Rusk State Hosp. v. Black*, 392 S.W.3d 88 (Tex. 2012)(citations omitted)). Clark exhausted her administrative remedies under the Texas Labor Code by filing a Charge to the EEOC and by amending her Charge to the EEOC. The EEOC issued Clark a right to sue letter, dated September 28, 2009. The District cites *Nairn v. Killeen Indep. Sch. Dist.*, 366 S.W.3d 229, 248 (Tex. App.—El Paso 2012, no pet.) in support of its position. However, *Nairn* is distinguishable because the plaintiff in *Nairn* neither asserted claims under the labor code nor exhausted her administrative remedies under the labor code. Furthermore, in *Nairn*, factual determinations which precluded re-

50

litigation were made by the Commissioner of Education. *Id.* at 246-47. In this case, the only "findings" were those of Kershner in her letter recommending termination, and Kershner's "findings" were made without affording Clark a full evidentiary hearing or even a reasonable investigation.

**F.     Arguing in the alternative, the District's reasons for Clark's termination were pretext.**

Clark asserts that her burden in overcoming a plea to the jurisdiction is to establish only her *prima facie* case of retaliation for the reasons explained earlier in the introduction to section I and section III(A). However, in an abundance of caution, Clark has shown that the District's reasons for her termination were a pretext and that she would not have been terminated "but for" her protected activity. Specifically, Clark's exemplary record and the closeness of time between the reporting and termination is evidence of retaliatory motive. Furthermore, Clark was treated more harshly than similarly situated employees.

Courts have consistently held that a short time period between reporting a violation of law and termination is sufficient to satisfy the causal or connection requirement for summary judgment purposes. *See, e.g., Evans v. City of Houston,* 246 F.3d 351, 356 (5th Cir. 2001)(time lapse of five days was sufficient to provide a causal connection); *Wade v. Minyard Food Stores,* No. 3:03-CV-1403-B, 2005 U.S. Dist. LEXIS 4973 (N.D. Tex. Mar 25, 2005)(less than one month between harassment, complaint and termination was sufficient to satisfied causal connection); *Weeks v. NationsBank,*

51

*N.A.*, No. 3:98-CV-1352-M, 2000 U.S. Dist. LEXIS 4069 (N.D. Tex. Mar. 30, 2000) (time lapse of up to four months was sufficient to satisfy the cause of connection for summary judgment purpose). Clark was placed on a TINA plan **within days** of Kershner's receipt of the EEOC charge, and the TINA plan was the beginning of the end for Clark. Under the TINA plan, Kershner gave one of Clark's harassers, Michelle Boyer, the authority to evaluate Clark's performance and thus influence over Clark's continued employment. Once the TINA plan was in effect, Kershner carefully scrutinized Clark's every move and accepted as true every statement by her harassers and ignored all evidence in Clark's favor. This culminated in Kershner's recommending Clark's termination. Moreover, the District specifically listed the communication difficulties between Clark and her harassers as one of the reasons for her termination. Accordingly, there is strong evidence of a causal connection between Clark's reporting of harassment and her termination.

Clark's exemplary record and the closeness of time between the reporting and the institution of the TINA plan are evidence that the District's proffered reasons for placing her on a TINA plan and for terminating her employment are pretextual. Clark can show that the District board was unreasonable because prior to her filing her charge with the EEOC, the District had not communicated any demonstrable problem with her performance, had issued her no warning, and had not documented any deficiencies in her job performance. In short, Clark had no adverse employment history until she reported discrimination to the EEOC. Once she filed her complaint,

52

the District abruptly began creating a paper trail in order to terminate her employment. Clark may show that the District's proffered reason for the adverse job action is merely a pretext for retaliation by showing that the reason is "unworthy of credence." *Bowen v. El Paso Electric Co.*, 49 S.W.3d 902, 909 (Tex. App.—El Paso 2001); *El Paso Cmty. College v. Lawler*, 349 S.W.3d 81, 87 (Tex. App.—El Paso 2010). Given Clark's excellent record, the jury could conclude that the District's reasons for terminating her lack credibility but were fabricated after the report of discrimination. "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 147 (2000). Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. *Cf. Furnco,* 438 U.S. at 580.

Clark has also shown disparate treatment through a similarly situated employee. As discussed earlier in pages 23-25, *infra*, Clark was treated more harshly than Ann Monterrubio who was the subject of complaints by Clark, fellow teachers, students, and parents. Clark was fired for a first time offense which only came up after she reported sexual harassment to the EEOC. The recommendation to terminate Clark

53

was also suspicious since it was made by the person who Clark reported as retaliating against her. In contrast, Monterrubio was not terminated or in any way disciplined for the multiple complaints by co-workers, parents, and students. According to Bashara's testimony, Clark was also treated more harshly than other employees who were placed on TINA plans or who were accused of similar conduct. (CR 450-51)

Considering that "but for" causation is the standard of proof in a trial on the merits, Clark has easily met the standard to plead a *prima facie* case and thereby survive a Plea to the Jurisdiction. The District contends that Clark was placed on a TINA plan and ultimately terminated because Clark was struggling to meet performance standards, comply with district policies, and adhere to rules of ethics. The TINA plan was subjective, required that Clark communicate effectively with the very people who were harassing her, and required that Clark utilize a grievance policy that was not relevant to her situation.

The **only** evidence the District offers to support their proffered legitimate non-discriminatory reason is Kershner's deposition and Kershner's affidavit. However, Kershner did not follow the District's sexual harassment policy but instead took it upon her herself to be judge, jury, and executioner. Kershner's own testimony belies her credibility. During the previous school year, Kershner gave Clark a perfect score on her classroom observation and a high score on her summative review. Clark received one of the best, or the best, reviews Kershner had ever given, yet she was terminated.

54

Also indicative of pretext is the manner in which the District handled Clark's reports of sexual harassment. Boyer and Lucas merely ignored the reports. Kershner failed to follow district policy and conducted an inadequate investigation culminating in a report that scolded Clark. In contrast, when Kershner enlisted Bashara to investigate complaints against Clark, they both meticulously documented Clark's every error or perceived impropriety. The facts in this case create the inference that the District's stated reason for terminating Clark was untrue, but rather a pretext for discriminatory action.

Clark's claim of discrimination is more than just a "subjective opinion or disagreement with a business decision." *E.E.O.C. v. Omni Hotels Mgmt. Corp.*, 516 F. Supp. 2d 678, 702 (N.D. Tex. 2007). The facts in this case create a picture that, viewed objectively, demonstrates retaliation. Clark reported sexual harassment as required under the District's policy, and in retaliation the District embarked on a campaign to discredit her and ultimately terminate her employment. The facts also establish that the District's proffered reason was untrue and that retaliation was a motivating factor in terminating Clark.

Taking Clark's allegations as true, as the Court must at this stage, they state a *prima facie* case of retaliation in violation of the TCHRA. Thus, the District's sovereign immunity is waived as to Clark's retaliation claim.

## CONCLUSION & PRAYER

The district court properly denied the District's plea to the jurisdiction. Clark

55

alleged *prima facie* facts of sex discrimination and retaliation against the District under the TCHRA, and thus, the District's sovereign immunity is waived for this case.

Therefore, the district court properly concluded it had subject matter jurisdiction over this case. The order denying the plea to the jurisdiction should be affirmed and this case should be remanded for proceedings on the merits.

Respectfully submitted,

By: _____

**Brendan K. McBride**
State Bar No. 24008900
brendan.mcbride@att.net
THE MCBRIDE LAW FIRM
 Of Counsel to GRAVELY & PEARSON, LLP
425 Soledad, Suite 620
San Antonio, Texas 78205
(210) 227-1200 Telephone
(210) 881-6752 Facsimile

And

**Matthew R. Pearson**
State Bar No. 00788173
mpearson@gplawfirm.com
Tracie Gee Conner
State Bar No. 24074066
tconner@gplawfirm.com
GRAVELY & PEARSON, LLP
425 Soledad, Suite 600
San Antonio, Texas 78205
(210) 472-1111 Telephone
(210) 472-1110 Facsimile

COUNSEL FOR APPELLEE,
CATHERINE CLARK

56

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded on this 6th day of March, 2015 via email and hand delivery to Appellant's counsel:

Robert A. Schulman
Leonard J. Schwartz
Bryan P. Dahlberg
SCHULMAN, LOPEZ & HOFFER, L.L.P
517 Soledad Street
San Antonio, TX 78205

_____
Brendan K. McBride

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is in compliance with the rules governing the length of briefs prepared by electronic means. The brief was prepared using Microsoft Word 2010. According to the software used to prepare this brief, the total word count, including footnotes, but not including those sections excluded by rule, is 14,924. The brief was prepared using "Garamond" 14-pt. font for the body, and 12-pt. font for the footnotes.

_____
Brendan K. McBride